**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**CARLA MERCADO,**

**Plaintiff,**

**v.**

**Civil Action No. 2:11cv145**

**LYNNHAVEN LINCOLN-MERCURY, INC.,**
**a/k/a "Lynnhaven Lincoln-Mercury Kia," and**
**"Lynnhaven Lincoln-Mercury Kia, Inc.",**

**Defendant.**

## BRIEF IN SUPPORT OF MOTION FOR SANCTIONS

COMES NOW the plaintiff, Carla Mercado ("Mercado"), by counsel, and submits this brief in support of Plaintiff's Motion for Sanctions under Rule 11 of the Federal Rules of Civil Procedure, seeking sanctions against the defendant's counsel, Susan Childers North, and the law firm of LeClairRyan, P.C. (collectively referred to herein as "Ms. North"), for the reasons stated hereafter.

## I. PRELIMINARY STATEMENT

This is a sexual harassment case, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*., arising out of the employment of the plaintiff by the defendant from March 20, 2006 through March 8, 2009 as a car saleswoman at a car dealership known as "Lynnhaven Lincoln-Mercury Kia," located at 2375 Virginia Beach Boulevard, Virginia Beach, Virginia.

On August 22, 2011, the defendant, Lynnhaven Lincoln-Mercury, Inc. ("Lynnhaven"), filed a Motion for Summary Judgment signed by Ms. North, lead counsel for the defendant. Ms.

North included in her brief a section entitled "Statement of Undisputed Material Facts," in which Ms. North listed 55 paragraphs containing ostensibly undisputed facts. Def.'s Mem. Supp. Summ. J., 1-10. In reality, many of the "Undisputed Material Facts" were clearly disputed, and, as such the characterization of such "facts" as "undisputed" was "improper," without "evidentiary support," and were not "warranted by the evidence." Fed. R. Civ. P. 11(b) 1-4.

Consequently, the plaintiff was required to not only dispute the actual misrepresentations, but search the entire record to locate admissible evidence demonstrating that many of Defendant's "Undisputed Material Facts" were in fact hotly disputed and also cite to the record the countervailing evidence, as more particularly described herein. This unnecessary exercise consumed many hours, but was necessitated because of Local Rule 56(B), requiring a litigant taking issue with ostensibly undisputed facts to "cit[e] the parts of the record relied on to support the facts alleged to be in dispute." E.D. VA. Local Rule 56(B). Plaintiff seeks sanctions pursuant Rule 11 because defense counsel has made completely unsupportable representations that certain facts were "undisputed" when they were very much disputed, thereby jeopardizing Plaintiff's claims and causing counsel and the Court unnecessary work, which could have been better spent litigating the merits of the case.

## II. DISPUTED MATERIAL FACTS

Plaintiff seeks sanctions because of Lynnhaven's "Undisputed Material Facts" Nos. 30, 39, 6, 31, 32, and 55.

### A. Lynnhaven's "Undisputed Material Fact" No. 30:

> Juan Lewis never sexually harassed Mercado, or any other employee at Lynnhaven . . . . *He never grabbed, touched, or rubbed Mercado's buttock at any time during her employment, or*

> *otherwise . . . . He never kissed Mercado on any occasion . . . . He never made sexual comments directed at Mercado or other employees during Lynnhaven's sales meetings . . . . He never told Mercado, or any other Lynnhaven employee, to "get under his desk* . . . . He never told Mercado, or any other employee, that they needed to perform oral sex to get a promotion. *He never touched Mercado in an inappropriate manner or requested any sexual favors from her outside of Lynnhaven, including at the Wal-Mart store where Mercado also worked . . . . He never asked any sales associate, including Mercado, "Are you Puerto Rican? Want some in you?"*

Def's. Mem. Supp. Mot. Summ. J., at 6-7 (emphasis added).

Substantially all of "Undisputed Material Fact" No. 30 is actually disputed. Mercado testifies in her deposition, "It started off with him [Juan Lewis] just touching my rear end and it got to the point where he was grabbing my buttocks like that (demonstrating) . . . . [H]e didn't just tap me. He grabbed my rear end." Exhibit 1 (Mercado's deposition), 136/6 - 8; 136/18 - 19. She testified that Juan Lewis grabbed her rear end on "[n]umerous occasions." *Id.*, 136/20 - 21. Mercado described, "At first he would put his hand around my waist and then he just kind of rubbed down my rear and I would push him away, and . . . one time . . . when I was walking . . . through the Lincoln-Mercury showroom like in the reception desk area . . . he grabbed my rear end." *Id.,* 136/25 - 137/6. When asked, "From September of 2008 to March 9th, 2009, how many times do you think he touched you on the buttocks?" Ms. Mercado said, "Numerous times, several times a week." *Id.*, 139/1 - 6. She also described an incident in the Kia showroom when she had just sold a vehicle and, "Juan grabbed me and kissed me on the lips" (*id.*, 148/18 - 25) and that she "pushed him away" (*id.*, 149/14).

Mercado testified about sexual remarks that Juan Lewis made to her. For example, she said that when she spoke with Juan Lewis about a promotion to the finance department, he said,

"You know what to do," and "Get on your knees; get under my desk; go get under my desk" (*id.* 160/21 - 161/3; *see also id.*, 146/9; 146/10 - 12; 156/4 - 18; 183/13 - 18); and that during the Christmas season, "Mr. Lewis came up . . . and asked what I had on underneath my shirt" (*id.*, 152/5 - 12); that while she was working a second job at Walmart in December 2008, Mr. Lewis showed up and "he grabbed me on my rear . . . and he told me . . . "Go pick out some sexy lingerie and meet me back at my house" (*id.*, 153/11 - 23). Mercado also testified about sexual remarks Juan Lewis made to other female co-workers. For example, Mercado said that during a morning sales meeting in 2008, Juan Lewis asked a female co-worker, "Do you have any Puerto Rican in you? . . . Do you want or would you like to have some in you?" (*id*. 163/10 - 21); and that he "would . . . make comments to girls if their hair was a little bit messy, 'Oh, it looks like you had a rough night last night,' and . . . would make reference to Sylvia Lewis if she wore a short skirt in the meeting, he would just kind of humiliate her." *Id.*, 164/7 - 11.

Other witnesses also described in deposition incidents where Juan Lewis sexually harassed, kissed, touched, caressed, or made sexual remarks to Mercado and other subordinates at Lynnhaven. For example, female co-worker Sylvia Lewis testified about sexual remarks Juan Lewis made to Mercado, including that when she and Mercado were trying to get into the Finance and Internet office, Juan Lewis "told Carla if she wanted to get in that position, she has got to get underneath the desk" (Exhibit 2 (Sylvia Lewis' deposition), at 19/15 - 18); "I thought he was telling her . . . she would have to get underneath his desk and – [t]hat she would need to give him oral sex . . . [b]ecause the way he was standing and how he was gesturing and it was understood that that's exactly what he meant" (*id.*, 20/22 - 21/8); and that on another occasion, "Carla and I . . . were talking about how we could get into the finance department and Juan

walked over and sat down and so we asked him again . . . and he turned to Carla and . . . had his legs spread open and told her . . .[t]hat she would have to . . . perform oral sex on him to get into that office" (*id.*, 22/ 3 - 23).

Sylvia Lewis also testified, "I've seen him [Juan Lewis] feel up on Nakia Bibbs, Shannon Daniels . . . Rebecca Haltom" (*id.,* 37/23 - 38/2); that regarding Nakia Bibbs, Sylvia Lewis observed "[a] lot of touching, hugging, feeling, rubbing . . . [m]aybe once a day, once every other day . . . [for] [m]aybe a couple of months" (*id.*, 38/15 - 24); regarding Shannon Daniels, she witnessed "[j]ust one time a rub on the rear and a comment from [Shannon Daniels] . . . that [Juan Lewis] was rubbing up on her rear and feeling her up" (*id.*, 41/6 - 10; 42/20 - 21); and regarding Rebecca Haltom, that Juan Lewis "made several comments about the size of her breasts . . . [t]o me" (*id.*, 46/9 - 24). Sylvia Lewis also testified that Juan Lewis kissed, touched, caressed, or made sexual remarks to her, including that "about every day" Juan Lewis told Sylvia Lewis "[s]it on my lap" (*id.*, 69/20 - 70/1); that Juan Lewis told her about four or five times, "[s]how me your titties" (*id.*, 70/18 - 25); that on one occasion, "[Juan Lewis] had his arms crossed and I was stand [sic] there and he was reaching his hand from across over to feel on my breasts . . . [and] [h]e actually touched it . . . [m]ore like a rub, sort of a feel" (*id.*, 78/20 - 79/8); that "he kissed me in the mouth" (*id.*, 81/11) by "[s]ort of kind of grabb[ing] my face . . . . both hands on the side of my mouth pulling his face towards me" (*id.*, 82/17 - 25); that "[t]here was some rubbing going on, sort of . . . [t]he pelvic area . . . He would sort of try to get behind me" and "he tried to put his penis between my legs" (*id.*, 85/17 - 86/10); and that a "second occurrence" happened when "[Juan Lewis] did the grabbing again and tried to come behind me again" (*id.*, 89/8 - 15).

Co-worker, Vincent Holley, testified that "at one point a comment came up asking about, you know, it was necessary for promotion, there was some comment made about getting under the desk" (Exhibit 3, Vincent Holley's deposition at 12/2 - 13), that Juan Lewis had made the comment about getting under the desk (*id.,* 13/6 - 8), and "[the comment] was actually [made] in a sales meeting" (*id.*, 13/2 - 25); and that he observed Juan Lewis patting women on their rear on one or two occasions (*id.*, 20/4 - 10). When Mr. Holley was asked, "Do you recall [Juan Lewis] ever telling a lady to get on her knees," he responded, "Yes, I do . . . to the best of my recollection, it occurred – this was something that occurred in a sales meeting as well." *Id.*, 24/24 - 25/10.

Co-worker, Robert Jacobs, testified in his deposition that he observed "Mr. Lewis, Mr. Threepenny, and Ms. Lewis was in Mr. Threepenny's office and I saw [Juan Lewis] kind of get up behind her and kind of bend her over like he was humping her from the back." Exhibit 4 (Robert Jacobs' deposition), at 32/19 - 33/1; that he observed Juan Lewis "touching females on the buttocks" (*id.*, 34/15 - 16); that the touching of females by Juan Lewis would "go from here to their buttocks, like from their back to their butt (demonstrating)" (*id.*, 35/13 - 14); and that regarding events between Juan Lewis and female co-worker, Nakia Bibbs, "It was plain to see in the dealership that something was going on there . . . . Touching . . . . On the buttocks . . . about a dozen [times] during the time she worked there. It happened all the time and blatantly." (*id.*, 76/11 - 77/6).

In view of the foregoing testimony, it is inexplicable how a lawyer could represent to this Court that the assertions in Defendant's "Undisputed Material Fact" No. 30 are undisputed.

**B. Lynnhaven's "Undisputed Material Fact" No. 39:**

> Mercado failed to show up for a scheduled workday on March 8, 2009. *Mercado also failed to notify her supervisors that she would not be at work and did not report for her work shift* . . . . This violation of policy occurred on three consecutive Sundays, with the third occasion being March 8th . . . . When Mercado failed to show up for work, Lynnhaven considered her unexcused absence to be a resignation effective March 9, 2009.

Def's. Mem. Supp. Mot. Summ. J., at 8 (emphasis added).

While Mercado did fail to work on March 8, 2009, whether notice was provided is directly disputed. *See* Exhibit 1 (Mercado's deposition), 121/7 - 14, as follows:

> A Yes. And also I had let him know in March. March the 7th I had a conversation with Leo [Charuau] and I was standing on the Kia showroom floor and told him I could not find day care because I didn't know I had to work that Sunday and I could not make it in and he told me not to worry about it.
>
> Q What Sunday was that?
>
> A The 8th, March 8th.").

*See also id.*, 122/17 - 123/21, as follows:

> Q * * * Did you call anyone at the dealership on March 8th, 2009, and let them know that you could not come into work?
>
> A Yes, I did.
>
> Q Who?
>
> A Sam Threepenny.
>
> Q Anyone else?
>
> A No.
>
> Q You spoke to him personally on the phone?

A Yes, I did.

Q Okay. And what did he say?

A He said you need to get to here and I told him that I had no one to watch my children.

Q He indicated to you, in fact, that he had no idea that you weren't coming in that morning, right?

A Who?

Q Mr. Threepenny when you talked to him?

A No.

Q He was surprised that you weren't coming into work, wasn't he?

A No.

Q Did you indicate to him that you had spoken to Mr. [Charuau] beforehand?

A Yes, I did.

Q And what did Mr. Threepenny say?

A He really didn't say anything that I can remember.

Q Well, he said he didn't know about it though, right?

A Not that I'm aware of.

*See also id.*, 126/22 - 127/25, as follows:

Q So you say on Sunday, March 8th you called the dealership and left a message with the receptionist that you couldn't come into work that day; is that right?

A Yes.

Q So did you call and talk with the receptionist or did you call

and talk with Sam Threepenny?

A Both . . . .

Q Okay. Didn't you just testify a minute ago that you didn't call anyone else? I just asked you who else did you call and you said no one.

A Well, the receptionist answers the phone. I thought you meant who did I talk to in a management position.

Q Okay. So you called the dealership, the receptionist answered the phone –

A She always answers the phone. I think she told me he wasn't available.

Q And you left a message with her that you wouldn't be into work?

A Uh-huh. (Yes)

Q Okay. And you recognize that is a violation of the company policy that we reviewed earlier, right?

A And what is that?

Q That you must leave a message with your sales manager and no one else?

A And I did leave a message with Leo [Charuau] the day prior which is one of my sales managers.

**C. Lynnhaven's "Undisputed Material Fact" No. 6:**

> Mercado's first employment period with the company ended on March 5, 1999 when she resigned her employment . . . . Mercado's second employment period with the company ended on January 20, 2003 when she resigned her employment . . . . Her third employment period with the company ended on March 8, 2009 *when she resigned her employment.*

Def's. Mem. Supp. Mot. Simm. J., at 2 (emphasis added).

Lynnhaven's assertion that Mercado resigned from her job at Lynnhaven is very much in dispute. Mercado testified in deposition that she was fired, "I was fired from my job. I did not quit in March . . . . I didn't leave. I was asked to leave" (Exhibit 1 (Mercado's deposition), 99/1 – 14). *See also* Exhibit 5 (Samuel Trapani's deposition), 10/12 ("she was terminated").

**D. Lynnhaven's "Undisputed Material Fact" No. 31-32:**

> Neither Juan Lewis nor Sam Threepenny ever retaliated against Mercado. * * * Neither Juan Lewis, nor anyone else at Lynnhaven, directed any sales or leads away from Mercado.

Def's. Mem. Supp. Mot. Simm. J., at 7 ("Undisputed Material Fact" Nos. 31 and 32).

Mercado certainly disputes the denial of retaliation. Juan Lewis was General Manager and Sam Threepenny was Sales Manager. Her sales could not have been cut without the collaboration of Lewis and Threepenny.

Mercado testifies there was retaliation by Lewis, Threepenny, and the defendant, including that other employees were told to stay away from her and that her sales were being diverted. For example, Mercado stated, "I know people were told to stay away from me" (*id.*, 185/5 - 18); "I don't believe that I was receiving the same amount of deals as other salespeople . . . . [L]eads would come in from the internet office . . . . They were suppose [sic] to go by this board and my name never got on the board" (*id.*, 192/2 - 14).

In response to the question, "did he [Juan Lewis] specifically reject any because you refused his sexual advances," Mercado said, "In my belief . . . . I had numerous deals that weren't getting done, people that should have been getting done" (*id.*, 193/22 – 194/7); "I would say a lot of my deals just weren't getting done" (*id.*, 196/11 - 12); and responding to the question, "How many do you think were denied because you specifically refused Juan Lewis's sexual requests?"

Mercado replied, "I would say numerous . . . . Seven, eight, nine" (*id*., 197/8 - 13). In response to "[H]ow do you know they were denied because you refused his [Juan Lewis'] sexual requests," Mercado said, "Because in my opinion they were deals that were easily made" (*id.,* 197/14 – 17).

Sylvia Lewis testified that during the same time she watched how Mercado's sales were "going in the tank" and "her deals were not getting done." Exhibit 2 (Sylvia Lewis' deposition), 106/21 – 23; 107/1 – 16. When Sylvia Lewis suggested to Juan Lewis that Mercado, as single mother needed income to support her children, Juan Lewis crudely and callously responded, "Fuck her kids." *Id.*, 107/21 – 108/4. Sylvia Lewis concluded, "I watched her dwindle to nothing." *Id.*, 112/10-21.

**E. Lynnhaven's "Undisputed Material Fact" No. 55:**

> Mercado never sought or received treatment from a counselor, psychologist or psychiatrist for any stress or anxiety, either during her employment with Lynnhaven or afterwards. . . . *She never experienced any specific stress or anxiety caused by Juan Lewis or Lynnhaven.*

Def's. Mem. Supp. Mot. Simm. J., at 10 (emphasis added).

Whether Mercado experienced emotional distress as a result of the sexual harassment is certainly not "undisputed." Mercado testifies, "The embarrassment of having to go through it all. I'm – not being able to sleep, nervous wreck all the time . . . . '08, the not being able to sleep, crying, shaking . . . Until now, current." Exhibit 1 (Mercado's deposition), 211/14 – 213/15. In addition, in response to an interrogatory "to identify and describe the nature of any medical, psychiatric or psychological conditions, illnesses, or injuries you attribute to Lynnhaven as a result of the allegations contained in your Complaint," Mercado also stated under oath, "Plaintiff

has been frequently reduced to tears, lost sleep, trembled, experienced headaches, had difficulty concentrating, lost appetite, nervousness and distress. Plaintiff has suffered and continues to suffer severe emotional distress, including but not limited to humiliation, embarrassment, and indignity to her feelings." Exhibit 6 ( Plaintiff's Fourth Supplemental Answers to Defendant's First Set of Interrogatories), answer to interrogatory No. 17.

## III. ARGUMENT

Rule 11 of the Federal Rules of Civil Procedure allows the imposition of sanctions against an attorney and her law firm for violations of Rule 11(b) for mischaracterizing facts as undisputed.

> If . . . the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. *Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, association, or employee.*

FED. R. CIV. P. 11(c) (emphasis added).

Rule 11(b) of the Federal Rules of Civil Procedure provides further as follows:

> (b) *Representations to Court.* – By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing

> new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

FED. R. CIV. P. 11(b).

In *Johnson v. Verisign, Inc.*, 2002 WL 1887527, at *22 (E.D. Va. 2002), this Court recognized "misrepresentations by Defendants in their affidavits presented on summary judgment raise the issue of whether Rule 11 sanctions should be imposed against Defendants' counsel."

> Rule 11 imposes an obligation on all officers of the court to ensure that the allegations and other factual contentions in their written submissions have evidentiary support. *See* Fed. R. Civ. P. 11(b)(3). Several obligations flow from this basic rule. First, reasonable inquiry must precede the presentation of any pleading, written motion or other paper. *See Cabel v. Petty,* 810 F.2d 463, 466 (4th Cir.1987). Second, a deliberate misstatement may not be presented as a statement of fact. *See Frazier v. Cast,* 771 F.2d 259, 265 (7th Cir.1985). Third, an omission may be equally misleading as an affirmative false statement. *See In Re Ronco,* 838 F.2d 212, 218 (7th Cir.1988).

*Id*. Accord, *Brubaker v. City of Richmond*, 943 F.2d 1363 (4th Cir. 1991).

The defendant's counsel listed 55 paragraphs of ostensibly "undisputed" facts. In reality, many of those statements were and are in serious dispute.

The purpose of Local Rule 56(B) is to facilitate the fair and accurate distillation of issues at the summary judgment stage, to set traps for parties who simply do not have the energy, time and other resources to rebut and cite to the record, misrepresentations of counsel. Litigation tactics that can serve no purpose other than "to harass, cause unnecessary delay, or needlessly

increase the costs of litigation," and factual contentions that have no evidentiary support, are expressly forbidden by Fed. R. Civ. P. 11(b)(1) and (3), and should not be tolerated.

## IV. CONCLUSION

For these reasons, the plaintiff, Carla Mercado, by counsel, moves this Court to impose sanctions against defendant's counsel, Susan Childers North, and the law firm of LeClairRyan. It is the role of the Court, not counsel, to fashion remedies appropriate for given violations of Fed. R. Civ. P. 11. However, if the Court should decide sanctions are appropriate, Plaintiff's counsel is prepared to respond to any Court inquiry as to what the appropriate sanctions in this case might be.

Respectfully submitted,

CARLA MERCADO

By: /s Jeremiah A. Denton III
Of Counsel

Jeremiah A. Denton III, Esq.
VSB #19191
Vivile R. Dietrich, Esq.
VSB #72893
*Attorneys for Plaintiff, Carla Mercado*
Jeremiah A. Denton III, P.C.
477 Viking Drive, Suite 100
Virginia Beach, VA 23452
Tel. 757/340-3232
Fax. 757/340-4505
jerry@jeremiahdenton.com
viv@jeremiahdenton.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of October 2011, the foregoing Plaintiff's Brief in

Support of Motion for Sanctions was filed electronically with the Clerk of the Court using this CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian G. Muse (VSB #47218)
Susan Childers North (VSB #43068)
LeClairRyan, A Professional Corporation
5388 Discovery Park Boulevard, Third Floor
Williamsburg, VA 23188
(757) 941-2801 (Tel.; Susan Childers North)
(757) 941-2802 (Tel.; Brian M. Muse)
(757) 941-2879 (facsimile)
Email: brian.muse@leclairryan.com
Email: susan.north@leclairryan.com

David C. Burton (VSB #33178)
Sara Berg Rafal (VSB #43840)
Ashley Walker Winsky (VSB #79224)
Williams Mullen
222 Central Park Ave., Suite 1700
Virginia Beach, VA 23462-3035
(757) 499-8800
(757) 473-0395 (facsimile)
Email: dburton@williamsmullen.com
Email: srafal@williamsmullen.com
Email: awinsky@williamsmullen.com

*Attorneys for Lynnhaven Lincoln -Mercury, Inc.*

/s/ Jeremiah A. Denton III
Jeremiah A Denton III
VSB #19191
Jeremiah A. Denton III, P.C.
477 Viking Drive, Suite 100
Virginia Beach, VA 23452
Tel. 757/340-3232
Fax. 757/340-4505
jerry@jeremiahdenton.com
*Attorney for Plaintiff, Carla Mercado*